UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| THE BELDEN LOCKER COMPANY, | ) | CASE NO. 06-60316 |
| | ) | |
| Debtor. | ) | JUDGE RUSS KENDIG |
| | ) | |
| | ) | **MEMORANDUM OF OPINION ON** |
| | ) | **DEBTOR'S OBJECTION TO** |
| | ) | **OWBC CLAIMS (NOT INTENDED** |
| | ) | **FOR PUBLICATION)** |

    This matter comes before the Court on the Motion for Partial Summary Judgment filed by Debtor Belden Locker Company ("Belden" or "Debtor") on November 5, 2007, and the response and cross-motion for summary judgment filed by the Ohio Bureau of Workers' Compensation ("OBWC" or "Claimant") filed on December 3, 2007. Belden filed an objection to certain claims of OBWC on July 12, 2007. OBWC filed a response to Belden's objection on September 11, 2007. Belden then filed the instant motion, seeking partial summary judgment strictly on the issue of the character and priority of certain of OBWC's claims. OBWC then filed its response, seeking partial summary judgment on the issues of administrative priority and a determination of the allowed amount of one of OBWC's claims.

    The court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (O).

    Objections to claims are governed by Fed. R. Bankr. P. 3007 and, as contested matters, by Rule 9014. Motions for summary judgment are governed by Fed. R. Civ. P. 56, which Fed. R. Bankr. P. 7056 incorporates into bankruptcy practice. Motions for summary judgment are to be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986).

    This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the Court.

**FACTUAL AND PROCEDURAL BACKGROUND**

    From June 1, 1986, to May 10, 2006, Debtor was a self-insured employer under

Ohio's workers' compensation laws. It also maintained excess workers' compensation insurance coverage with a third party insurer.

In 2004, due to Belden's poor financial performance, OBWC required the company to provide additional security against future claims. On August 24, 2004, Belden executed a letter of credit ("LC") in favor of OBWC in the amount of $619,000.

On March 14, 2006, Belden filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Debtor obtained a first-day order permitting it to continue to operate as a self-insured employer under the Ohio workers' compensation laws. The U.S Trustee appointed a statutory unsecured creditors' committee on March 26, 2006.

After Belden filed for reorganization, OBWC drew upon the entire LC. The precise allocation of this money to OBWC's various claims remains an issue of material fact and is not within the scope of the legal issues to which the parties have cabined their motions.

OBWC filed five separate claims against Belden: three administrative claims, one priority unsecured claim, and one general unsecured claim. The instant motion for partial summary judgment contests only the priority status of one of the administrative claims and the priority unsecured claim, contending that both of these should be at most general unsecured claims. (Belden objected to all of the claims in full and has reserved those objections, to the extent they have not been resolved elsewhere at this juncture.) The first of these two is Claim No. 72, a priority tax claim in the amount of $612,071.86 (revised from an original figure of $945,439.17) based on a present value calculation of workers' compensation assessments that Belden would have owed over ten years from the petition date.

The second claim now before the Court is Claim No. 219, an administrative expense claim for payments to be made to Russell Hemli, an Belden employee who was injured on October 22, 2003. Hemli was awarded both normal workers' compensation and an additional award due to Belden's violation of a specific safety requirement ("VSSR"). OBWC acknowledges that the medical and indemnity paid on Hemli's base workers' compensation claim are captured in its general unsecured claim, Claim No. 73; Claim No. 219 is therefore only for Hemli's VSSR award. The amount of the claim is stated on OBWC's proof of claim, as yet unamended, as "unknown," but in its brief, OBWC states that the award was granted in the amount of $48,000.00. OBWC also seeks summary judgment allowing the Hemli claim in this amount. In addition, while OBWC filed Claim No. 219 as an administrative expense claim, it initially defends the claim alternatively as either an administrative or a priority tax claim (OBWC Resp. and Mem. 17-18). Its later briefs focus almost entirely on the priority tax argument (OBWC Resp. and Cross Mot. 17-18, OBWC Reply and Mem. 3), though it incorporates by reference its earlier brief arguing for either administrative or tax priority treatment. (Resp. and Mem. 17.)

# LEGAL ANALYSIS

## I. Future Statutory Assessments

Belden elected to operate as a self-insured employer under Ohio's workers' compensation regime. However, even employers who decide that it is in their interest to self-insure must still pay assessments to OBWC under Ohio Rev. Code Ann. §§ 4123.35 and 4123.351, and Ohio Admin. Code §§ 4123-17-32 and 4123-19-15. In addition, Ohio law requires that these assessments be collected even from employers who have ceased operating as a self-employed insurer, including by terminating their operations in their entirety. Ohio Rev. Code Ann. § 4123.35(J). These assessments go to fund administrative costs of the state workers' compensation program and the mandatory portion of the surplus fund. Ohio Admin. Code § 4123-17-32(G). Additionally, self-insured employers must pay a contribution to the self-insuring employers' guaranty fund, which provides for payment of compensation and benefits to an employer's employees in the event of an employer's default. Ohio Rev. Code Ann. § 4123.351(A), Ohio Admin. Code § 4123-19-15. The assessments are calculated based on a percentage of compensation actually paid on claims by an employer's employees. Claim No. 72 reflects OBWC's claim against Belden for these assessments.

### A. Tax Treatment of Self-Insured Assessments

Section 507(a)(8) of the Bankruptcy Code affords priority status to certain unsecured claims by governmental institutions. BWC's memorandum argues that Claim No.'s 72 and 219 are both entitled to priority under Code § 507(a)(8)(E), which accords priority unsecured status to

> (E) an excise tax on--
>
> > (i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or
>
> > (ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition.

The Court turns to Claim No. 72 first. Belden advances three counterarguments, in the alternative: first, that OBWC's self-insured assessments are not "taxes" under federal bankruptcy law; second, that even if they are taxes, the "transactions" actually occurred postpetition (i.e., too late); and third, that OBWC has not shown that the assessments accrued within the three-year prepetition window (i.e., too early or too uncertainly).

The Sixth Circuit set forth its standards for determining whether a financial obligation

to a government entity qualifies as a "tax" in Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc.), 998 F.2d 338 (6th Cir. 1993) ("Suburban I") and Ohio Bureau of Workers' Compensation v. Yoder (In re Suburban Motor Freight), 36 F.3d 484 (6th Cir. 1994) ("Suburban II"). In so doing, it elaborated on the Supreme Court's rule in City of New York v. Feiring, 313 U.S. 283 (1941), in which the Court held that, for the purposes of federal bankruptcy law, "taxes" are "those pecuniary burdens laid upon individuals or their property, regardless of consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." Id. at 285. The Suburban I court noted that lower courts, in the Sixth and other circuits, which had reviewed the status of workers' compensation premiums in different states had split on the question of whether they were taxes for bankruptcy law purposes. The court in that case found that the factor that most explained the disparate rulings was "whether an individual State's program is monopolistic, requiring the participation of of all employers operating within the State, or whether the state system merely 'competes' with private insurers or requires insurers to get private insurance." Suburban I at 340. Accordingly, the court held that premiums to Ohio's workers' compensation fund were taxes because "[t]he Ohio workers' compensation system is ... monopolistic and mandatory. The Ohio system is administered exclusively by the State, and the law allows for no private insurance option save self-insurance." Id. at 341.

In Suburban II, by contrast, the court held that the OBWC was not entitled to priority for either (a) claims by employees that OBWC satisfied when a self-insured debtor-employer defaulted on direct payment of those claims, or (b) claims by employees that OBWC paid from its workers' compensation fund while debtor-employer was a fund participant, but in default on its premiums. (In either situation, OBWC is under a legal obligation to pay the injured workers and then seek reimbursement from the delinquent employer.) The court held that Suburban I implicitly required that all four elements of the Ninth Circuit's test in In re Lorber Industries of California, 675 F.2d 1062 (9th Cir. 1982) be met, plus two additional elements, in order for a financial obligation to a government entity to qualify as a "tax." Suburban II at 488 ("Thus, while satisfaction of the Lorber test is necessary to qualify a government claim for priority treatment as an excise tax, it is not sufficient under the reasoning of Suburban I.") Under the quadripartite test in Lorber, a tax is (1) an involuntary pecuniary burden; (2) imposed by the state legislature; (3) for a public purpose; (4) under the police or taxing power of the state. Id. at 1066; Suburban II at 488. In addition, Suburban II held that Suburban I requires "(1) that the pecuniary obligation be universally applicable to similarly situated entities; and (2) that according priority treatment to the government claim not disadvantage private creditors with like claims." Suburban II at 488. The court then held that both claims of OBWC were not universally applicable to similarly situated entities; rather, the debtor's exposure to them was a punitive measure imposed on it for failing to comply with its statutory obligation to pay workers' compensation premiums. The premiums, per Suburban I, were the universally applicable obligation. The claims themselves that those premiums would have gone in part to fund were not. The court held that these claims more accurately resembled subrogation claims, not tax claims. In addition, the court held that giving priority treatment to the government would disadvantage private creditors with like claims: private companies had acted as sureties and issued bonds so that Suburban could be self-insured, and had been compelled to pay $1.7 million in compensation

claims because of Suburban's default on its self-insured obligations. OBWC has already effectively recognized that its claims and the sureties' claims were alike: it had reduced its own claim by $1.7 million to reflect the amount that the sureties had paid.

OBWC's self-insured assessments satisfy all the elements required by both Suburban I and Suburban II. They are involuntary pecuniary burdens laid upon individuals for the purposes of defraying the expenses of government or of undertakings authorized by it, and the Ohio workers' compensation system is no less monopolistic and mandatory now than it was when the Sixth Circuit held it to be so in Suburban I. See Suburban I at 341. In addition, the self-insured assessments are universally applicable to similarly situated entities, namely, all employers who elect to self-insure. Belden argues that self-insured assessments under O.R.C. § 4123.35(J) fail the universality test because they "occur only when an employer ceases operating and paying self-insured workers compensation benefits." (Belden's Reply and Resp., Dec. 17, 2007, 3.) Even were this true, it would not necessarily show that Belden is not in a similar situation to other defaulting self-insurers. However, Belden misstates the law, and the class of similarly situated entities to which Belden belongs is much larger and broader: *all* self-insuring employers must pay these assessments. The amount of an employer's obligation varies as a function of the amount of claims that employer has actually paid; however, this no more destroys universality than the fact that an the amount of income, property, or sales tax one owes varies with the amount of income one earns, property one owns, or purchases one makes.

In addition, there is no risk that according priority status to OBWC's claim for self-insured assessments against Belden will disadvantage similarly situated private creditors. There are no similarly situated private creditors. It is telling that Belden, knowing that its cause would be greatly aided by being able to point to a single private creditor, or even a hypothetical private creditor, with claims similar to the OBWC's claim for self-insured assessments, cannot do so. Its final brief in this case merely states that "careful analysis of a claim as a 'tax' is warranted" because allowing a claim to be classified as such means that one particular prepetition claim will be paid in a higher priority than other similarly situated claims. (Belden's Reply and Resp. 4.) Belden actually sells itself short here: if there are indeed similarly situated claims, more than careful analysis of the claim is called for; under Suburban II, denial of priority unsecured status is required. However, there are none here. No other entity had the power to levy these assessments against Belden. Nor is OBWC merely asserting its claim for these assessments while standing in the shoes of private claimants, as it constructively was for the injured workers in Suburban II. In Suburban II, either the private creditors paid the injured workers, or OBWC did; both then sought recovery from Suburban for doing so. No parallel or even close analogy exists between that situation and that presented by these self-insured assessments. These assessments go towards the funding of the administration of the workers' compensation system, an exclusively governmental function in Ohio.

Mapping the characteristics of workers' compensation obligations onto the Sixth Circuit's test to distinguish taxes from fees is a precarious exercise, and with respect to self-insured assessments in particular, there are factors that pull strongly in opposing directions.

These assessments have some characteristics of fees as well as taxes, most significantly that an employer makes a voluntary election to operate as a self-insured employer, and the assessments obligation arises by operation of law only after that election. Nevertheless, the Court finds that tax characteristics of Belden's liability for reimbursement for assessment payments predominate over its non-tax characteristics, and the Bureau's claim more closely resembles a universally applicable tax than a subrogation claim or any other variety of claim that a private creditor might likewise hold. The Court holds that the Bureau's claim satisfies the requirements of <u>Suburban I</u> and <u>Suburban II</u> and shall be accorded priority unsecured status as an excise tax under 11 U.S.C. § 507(a)(8)(E).

### B. Timing Issues

Belden's briefs also raise the issue of the timing of the transactions that give rise to OBWC's claims. Belden argues, in the alternative, that all or part of the claim for assessments relates to either post-petition periods or periods before three years before the petition date. The Code provides priority unsecured status to excise taxes only if a return for the transaction is last due after three years before the petition date, or, if a return is not required, a transaction occurring during the three years immediately preceding the petition. 11 U.S.C. § 507(a)(8)(E)(i)-(ii).

The first issue is what the relevant "transaction" is, under the statute's language. The parties' briefs are riddled with crosstalk on this point. The parties discuss three primary alternatives: the occurrence of injury, the Bureau's payment of compensation for that injury, and the act of employing workers itself. Belden urges the second alternative (Belden Mem. in Supp. 12); OBWC, the third. (OBWC Resp. to Obj. 14, OBWC Resp. and Cross Mot. 14.) Neither party is making a primary argument that the occurrence of injury is the relevant transaction.

OBWC notes that the Sixth Circuit held in <u>Suburban I</u> that an employer's obligation for workers' compensation *premiums* arises "through the transaction or act of employing." <u>Suburban I</u> at 340 n.1, quoting <u>New Neighborhoods v. West Virginia Workers' Compensation Fund</u>, 886 F.2d 714, 719 (4th Cir. 1989). The issue is whether self-insured *assessments* are effectively identical to premiums, such that the Sixth Circuit's ruling on the source of the obligation for the latter should encompass the former, or at least sufficiently analogous to premiums that the two might potentially be distinguished, but there is no logical reason for doing so. The Court adopts this latter approach. An employer's obligation to pay self-insured assessments under Ohio Rev. Code § 4123.35 manifests the moment the employer elects to operate as a self-insured employer and proceeds to employ individuals. It does not matter if that employer later ceases operations entirely or becomes a state fund participant; the obligation will remain. It is only the amount of the obligation, not its existence, that will be established later.

It is ultimately the time a tax obligation originates, not the time its final tally is ascertained, that matters for the purposes of § 507(a)(8). The Code envisioned such circumstances in allowing claims for taxes on pre-petition transactions that arise post-

petition to be treated as if they had arisen pre-petition. Under 11 U.S.C. § 502(i),

> [a] claim that does not arise until after the commencement of the case for a tax entitled to priority under section 507(a)(8) of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

In turn, subsection (c), on which OBWC relies, provides that a contingent or unliquidated claim can be estimated and allowed if the fixing or liquidation of the claim would "unduly delay the administration of the case." 11 U.S.C. § 502(c). There can be little doubt that waiting until all of Belden's former employees are dead or otherwise beyond the reach of the Ohio workers' compensation system would unduly delay the administration of the case. Some means of estimating the value of OBWC's claim is therefore necessary now. The Court reserves judgment on the issue of whether the methods and numbers actually used by OBWC to do so are meritorious; the parties have explicitly refrained from asking the Court to rule on the liquidated value of OBWC's claim. The Court would lack the necessary information to make such a ruling at this stage, anyway. Thus far, all OBWC has submitted are two pages of figures going back ten years from the petition date (Proof of Claim No. 72), and an assurance that it has used "state of the art industry standards in applying actuarial principles to estimate the net present value of compensation that will be paid to Debtor's injured workers." (OBWC Resp. and Cross Mot. 8 n.1.)

> Belden argues against OBWC's reading of § 502(i):
>
> A tax that is incurred pre-petition but is due and payable post-petition might include income taxes, property taxes, withheld sales taxes, etc., for a fiscal year that straddles a petition date. OBWC has cited no authority, and Belden is aware of none, that could cause *ten years* of estimated future assessments to have been 'incurred' pre-petition. Ten years of tax accrual stretches Section 502(i) of the Code beyond any logical breaking point.

(Belden Mem. in Supp. 12.) It is actually the combination of two authorities, however, not one, that yield this admittedly harsh result. What distinguishes self-insured assessments from the other taxes Debtor lists as more typical examples is that Ohio Rev. Code § 4123.35(J) explicitly *does* impose liability across an indeterminate number of subsequent years. Neither earning income nor owning property nor selling inventory carries with it such a persistent, lingering obligation. Earning income in 2006 does not expose one to income tax liability in 2007 or 2008. Because of the plain language of § 4123.35(J), however, the same cannot be said of self-insured assessments:

> An employer who no longer is a self-insuring employer in this state or who no longer is operating in this state, shall continue to pay assessments for administrative costs and for the portion of the surplus fund under division (B) of section 4123.34 of the Revised Code that is not used for handicapped

> reimbursement, based upon paid compensation attributable to claims that occurred while the employer was a self-insuring employer within this state.

Thus, hiring employees while a self-insured employer in 2006 does expose one to liability for assessments in 2007 and beyond, even should one cease to employ workers as a self-insured employer in those later years. Likewise, the language of 11 U.S.C. § 502(i) is plain on its face: it provides for the allowance of claims that arise after the commencement of the case; it does not include a far horizon. This may in fact have the effect of treating taxes arising in 2016 as if they had arisen in 2006. That ten-year horizon, however, is primarily an artifact of Ohio statute and OBWC's actuarial methods (and the Court emphasizes again that it is not ruling today upon the soundness of the methods or numbers OBWC has used); § 502(i) is only an enabler, taking the tax laws as it finds them. The Court must do the same.

Therefore, to the extent that OBWC's claim can be shown to flow from the act of employing individuals prepetition while enjoying the status of a self-insured employer, the claim merits priority unsecured status.

## II. The Hemli Claim

OBWC also argues that the Hemli claim should be accorded administrative expense priority under 11 U.S.C. § 503(b)(1)(A), or that it should be accorded status as a priority tax under 11 U.S.C. § 507(a)(8)(E). Neither argument appears well-founded, however. Administrative expense priority is unwarranted because the transaction from which the obligation arose, the injury, occurred pre-petition; administrative expense claims must arise post-petition. Tax priority is unwarranted because, bluntly, nothing is being taxed.

"It is an absolute requirement for administrative expense priority that the liability at issue arise post-petition." In re Sunarhauserman, 126 F.3d 811, 817 (6th Cir. 1997). Again, the most important threshold issue is determining the relevant transaction. OBWC argues that it is the date that the Industrial Commission of Ohio issues the award that is dispositive; Debtor argues that it is the injury. Here, Debtor is correct. When a tribunal (judicial or administrative) issues an award for an injury, the ultimate source of the liable party's liability is not the decree, it is the injury. A judicial or administrative process is only necessary to establish the magnitude of the damage done. As OBWC itself argues when it suits its purposes (in its argument with respect to the self-insured assessments claim), "the obligation to pay currently exists, even if the precise amount will be determined in the future." (OBWC Resp. and Cross Mot. 13-14.) This is true for both taxes and for claims for recoveries for injuries, including additional awards for injuries suffered due to violations of specific safety requirements. The alternative interpretation would actually reward the government for making its gears creak more slowly: an award issued the day before a bankruptcy petition was filed would enjoy at most priority tax treatment, while an award issued the day afterward could be entitled to administrative expense priority. The Hemli claim therefore cannot be an administrative expense because, while the state bureaucratic apparatus may have moved sufficiently slowly that the date of the award was post-petition, the injury that is the actual source of the claim occurred pre-petition.

Post-Suburban I and Suburban II, the Hemli claim can also not be accorded priority unsecured status as a tax. OBWC relies on In re Primeline Industries, Inc., 103 B.R. 861 (Bankr. N.D. Ohio 1987), which held that a VSSR award was a tax within the meaning of 11 U.S.C. § 507(a)(7)(E). This case was decided before Suburban I and Suburban II, however, and while it was not explicitly displaced by the Sixth Circuit, it is also clear that the Primeline court's analysis of what constitutes a tax does not map cleanly onto the test constructed by the Sixth Circuit. In essence, the Primeline court took OBWC at its word that the VSSR award was actually a premium because OBWC called it so and melded it into the employer's preexisting premium in order to collect the award. It then went on to hold that since premiums were taxes and the VSSR award was part of the premium, that the VSSR award was a tax.

This reasoning would be less than entirely persuasive in its own right even were it not for the Sixth Circuit's opinion on the matter. The Primeline court itself outlines the process by which VSSR awards are awarded; it much more closely resembles a private government lawsuit, or a hearing on imposing a fine, than a tax:

> Article II, Section 35 of the Constitution of the State of Ohio makes clear the basis both for the awarding of such funds to an employee as well as the charging of such amounts to to the employer. Essentially, that Section authorizes the Industrial Commission to determine whether an injury, disease or death of an employee was caused by the failure of the employer to comply with any specific requirement for the protection of the lives, health or safety of employees. When it is found, after hearing, that such is the case, the Industrial Commission is authorized to make specific additional awards for compensation to the employee and to charge such awards back to the employer by increasing the employer's premium.

Primeline at 862. Neither state legislative nor state judicial characterizations of financial obligations to government entities have binding effect on how those obligations must be characterized for bankruptcy purposes; the question is one of federal law. See Suburban I, 998 F.2d at 340. In fact, structurally, the economics of this transaction are little different than the claims in Suburban II which were explicitly held *not* to be taxes; "the additional premium charged is not for the benefit of the Bureau of Workers' Compensation but is for the benefit of the employee who was injured on the job." Primeline at 863. As in Suburban II, the government is really paying a private claimant and then seeking to collect reimbursement from the employer. The form of the collection process is immaterial to the nature of the underlying obligation.

Looking at the substance of the obligation, rather than its form–or its mere label–the Court finds that the VSSR award fails the universality requirement under Suburban II. This is not a liability universally applicable to similarly situated entities, unless the Court permits such a narrow reading of "similarly situated entities" that it would destroy the universality requirement itself. Belden would only be similarly situated to entities who violated the same specific safety requirement with the same result. Its obligation here is almost the opposite

of universal; it is highly fact-specific and particularized, necessarily dependent upon the results of a judicial or quasi-judicial proceeding. This stands in stark contrast with both quintessential examples of taxes–income, sales, and property taxes, which most individuals routinely file with no need for intermediate action by a judicial or quasi-judicial body–as well as with the premiums and assessments held to be taxes in <u>Suburban I</u> and this opinion, which may at times be subjects of litigation but will generally be paid by most of those subject to them without any need for a judicial or quasi-judicial process.

      The Court will enter an order consistent with this opinion.

/s/ Russ Kendig
RUSS KENDIG
U.S. BANKRUPTCY JUDGE

**Service List**:

The Belden Locker Company
1038 Belden Ave., N.E.
Canton, OH 44705

James Michael Lawniczak
1400 KeyBank Center
800 Superior Ave.
Cleveland, OH 44114

Official Committee of Unsecured Creditors
c/o Harry W. Greenfield
Buckley King LPA
1400 Fifth Third Center
600 Superior Ave
Cleveland, OH 44114

Wanda Borges
575 Underhill Blvd. #110
Syosset, NY 11791

Robert L. Doty
Assistant Attorney General
Collections Enforcement, Toledo Regional Office
One Government Center, Suite 1240
Toledo, Ohio 43604-2261

Joseph T. Chapman
Senior Assistant Attorney General
Collections Enforcement
150 East Gay Street, 21st Floor
Columbus, OH 43215